IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Elvia Medequari,[1] | ) No. CV 04-323-TUC-JMR (HCE) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| vs. | ) |
| Michael J. Astrue,[2] Commissioner of Social Security, | ) |
| Defendant. | ) |

On June 23, 2004, Plaintiff, through counsel, filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). On that same date, Plaintiff's case was assigned to the Honorable William D. Browning, United States Senior District Judge and was referred to the Honorable Nancy Fiora, United States Magistrate Judge pursuant to the Rules of Practice of this Court. On June 21, 2005, the reference to the Magistrate Judge was withdrawn. On July 22, 2005, the matter was reassigned to the Honorable John M. Roll, United States Chief District Judge. On September

---

[1]Plaintiff is named in the Complaint as: Elvia Medequari and this matter is captioned accordingly. Review of the record indicates the following spelling of Plaintiff's last name: Medeguari.

[2]On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as the defendant in this action.

15, 2005 this matter was referred to the undersigned Magistrate Judge for a Report and Recommendation.

Pending before the Court are the parties' Cross-Motions for Summary Judgment.  For the following reasons, the Magistrate Judge recommends that the District Court grant Plaintiff's Motion for Summary Judgment (hereinafter "Plaintiff's MSJ") and deny Defendant's Cross-Motion for Summary Judgment (hereinafter "Defendant's XMSJ").

I.      PROCEDURAL HISTORY

On July 12, 2002, Plaintiff submitted to the Social Security Administration (hereinafter "SSA") an application for disability insurance. (TR. 79–93)  Plaintiff indicated that she had been unable to work since April 16, 2002 due to "continuous back, neck, shoulder pain currently on anti-depression 'zoloft' medication."  (TR. 85) Plaintiff's application was denied. (TR. 59-63)  Plaintiff's request for reconsideration of the decision was also denied.  (TR. 65-68)

Plaintiff then requested a hearing before an administrative law judge (hereinafter "ALJ") and the matter came on for hearing on November 19, 2003 before ALJ Lauren R. Mathon.  (TR. 69-70, 25-53) Plaintiff was not represented by counsel at the hearing. (TR. 26) She was the only witness to testify.  On December 3, 2003, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (TR. 11-18)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR. 10) The Appeals Council, after considering additional evidence submitted by Plaintiff, denied Plaintiff's request for review thereby rendering the ALJ's December 3, 2003 decision the final decision of the Commissioner.  (TR. 6-8)   Plaintiff then initiated the instant action.

II.     THE RECORD ON APPEAL

A.      Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on July 8, 1958.  (TR. 79) On the alleged onset date of April 16, 2002, Plaintiff was 43 years of age.  In December 2003, when the ALJ ruled on Plaintiff's

claim, Plaintiff was 45 years of age.   Plaintiff is divorced, the mother of two grown children, and, at the time of the November 19, 2003 hearing, lived with her boyfriend.  (TR. 28-29)

Plaintiff completed school through the ninth grade and later obtained a GED.  (TR. 91) She attended two years of college.   (TR. 91) In 1988, she became a licensed cosmetologist. (TR. 30, 91) Plaintiff worked as a cosmetologist from 1988 to 1992, an officer manager from 1996 to 1998, and lastly, as a programs specialist from 1998 to 2002 for the City of Douglas, Arizona, where her duties included interviewing applicants for low-income housing. (TR. 32, 86, 98 ) Plaintiff stopped working her last job as a programs specialist on her alleged onset date of April 16, 2002.  (TR. 85)

Plaintiff was injured in September of 2000 when she fell from her chair at work and strained her right side.  (TR. 35, 85) As the result of the fall, Plaintiff saw a chiropractor and went to physical therapy.  (TR. 35) Plaintiff testified that during this time, her supervisor "started sending me memos that I was abusing sick time and that if this continued I would be...disciplined and I could lose my job.  And the whole time that I went to the doctor for my injury they made me use my sick pay."  (TR. 35) Plaintiff eventually complained to the union.  (TR. 35)

In April 2002, Plaintiff's back spasms were so severe that she thought she was having a heart attack.  (TR. 37) Plaintiff testified that she left work on medical leave that same month because "[m]y back was going into muscle spasms...I was placed on muscle relaxers and pain killers and I'm still on them...it's hard to function on those types of pills."  (TR. 37)

Plaintiff suffers from chronic back and neck pain that is "always there" even when she takes medication.  (TR. 42; *see also* TR. 43 (indicating she feels pain 24 hours a day, every day); TR. 107 ("I have a lot of pain and even sleeping will cause my neck and back discomfort. Usually will have to take muscle relaxers, pain pills on a daily basis.")) Plaintiff rates her constant pain as a nine on a scale from one to ten with one being mild and ten "being the absolute excruciating pain that would" cause her to go to the emergency room.

(TR. 44)   Exercises and manipulation do not help with the pain or stiffness that she experiences.  (TR. 43)

Plaintiff also has trouble sleeping at night.  (TR. 42) The muscle relaxers begin to take effect around 3:00 a.m. which "knock me out and then in the morning, I just–I can't wake up when I'm supposed to."  (TR. 42) Plaintiff takes sleeping pills to help her sleep.  (TR. 44)

Plaintiff also suffers from anxiety or panic attacks.  (TR. 44, 46) The frequency of these attacks "depends on...the situation" but they usually occur once a month.  (TR. 46) During such an attack, Plaintiff experiences shortness of breath, her arms and legs become numb, and she cries.  (TR. 46) Plaintiff is not taking medication specifically for these attacks. (TR. 46) However, Plaintiff takes zoloft for depression and it helps to calm her.  (TR. 44) Plaintiff's symptoms of depression include fatigue, inability to sleep, and lack of desire to go anywhere.  (TR. 45)

She only drives when necessary and her boyfriend does all the shopping because she does not go to the store.  (TR. 45) She has "[t]errible" concentration; can be watching a movie and not know  "what has gone on"; forgets what she says to family members; and cannot concentrate on one thing too long.  (TR. 45; see also TR. 106 ("sometimes have trouble remembering if I spoke with an individual.  I have to write things down.")) She blames her medication for her lack of concentration.  (TR. 45)

Plaintiff can sit in a chair for "about half an hour"; can stand for "[a]n hour or so"; and can walk "less than a mile" twice a week.  (TR. 46-47) She also testified that she "tried to walk on a regular basis but it takes a lot out of my...back, the pain that I have...."  (TR. 46) Plaintiff can lift up to three pounds comfortably and although she is able to lift a gallon of milk, " it takes a lot...out of my back."  (TR. 48) Plaintiff sometimes experiences numbness in her right hand.  (TR. 48)

Plaintiff's daily activities include rising at approximately 10:30 a.m., brushing her hair, resting on the couch, and showering after noon.  (TR. 49) Blow drying her hair "causes severe pain in my shoulder, neck, back."  (TR. 106) She continually experiences back

- 4 -

spasms.  (TR. 106)  She does the dishes, tries to do the laundry, but housekeeping takes her a "long time."  (TR. 50, 107) Plaintiff occasionally uses a sewing machine for mending.  (TR. 50) She can sit at the sewing machine for "[p]robably about half an hour."  (TR. 51) Her hobbies include walking, sewing and watching television.  (TR. 109) She is "always stressed out with a lot of back, neck, shoulder pain.  Pain medication also causes drowsiness."  (TR. 106)

Plaintiff has continued to look for administrative and clerical work but she does not believe that she can perform such work because of her lack of concentration.  (TR. 51)

B.   Medical Evidence

1.   Plaintiff's Physicians

a.  Physical Impairment

July 2001 records from Southeast Arizona Medical Center Rehabilitation Department reflect a physical therapy treatment plan for Plaintiff whose primary diagnosis was shoulder bursitis with a March 1, 2001 onset date.[3]  (TR. 185) Such plan included patient education, joint mobilization, stretching exercises, and aquatic therapy.  (TR. 185)

On December 12, 2001, Certified Nurse Practitioner Diana Comaduran (hereinafter "C.N.P. Comaduran") who works under Plaintiff's primary care provider David Knapp, M.D., noted that Plaintiff's chief complaints were: (1) anxiety attacks; (2) hypoglycemia; and (3) history of abnormal labs.  (TR. 172; Plaintiff's Statement of Facts, p.2) C.N.P. Comaduran's assessment was:

1.  history of hyperlipidemia

2.  anxiety attacks.

(TR. 172) C.N.P. Comaduran's plan for treatment included zoloft for six months to one year, counseling for anxiety, and diet counseling.  (TR. 172)

_____

[3]It appears that Plaintiff was referred to physical therapy by "Dr. Padilla."  (TR. 185)

A December 12, 2001 magnetic resonance imaging study (hereinafter "MRI") of Plaintiff's right shoulder revealed "[m]inor degenerative callus formation is seen involving the right AC joint."  (TR. 140) No evidence of complete or partial rotator cuff tendon tear was identified.  The impression was: "small amount of fluid seen within the subacromial bursa, perhaps related to subacromial bursitis."  (TR. 140)

On January 9, 2002, Jose A. Padilla, M.D., of Cochise Orthopaedic Clinic, examined Plaintiff and reviewed an MRI which he described as showing "just a little subacromial fluid but is otherwise completely normal."  (TR. 279) In response to Plaintiff's complaints of intermittent numbness in her hand, Dr. Padilla explained that such numbness is "a common finding with shoulder bursitis."  (TR. 279) Dr. Padilla noted that Plaintiff "can expect to always have a little bit of pain in her shoulder.   She seems very frustrated with this and has asked about medications."  (TR. 279) Dr. Padilla concluded that Plaintiff "is permanent and stationary, and I would expect in the future she may need 1-2 visits per year and the use of anti-inflammatories...."  (TR. 279) Dr. Padilla prescribed Ibuprofen.  (TR. 279)

On April 1, 2002, C.N.P. Comaduran examined Plaintiff upon Plaintiff's complaints of neck pain. (TR. 167) C.N.P. Comaduran's examination revealed that Plaintiff had full range of motion in her neck, back, and shoulders "with mild tenderness of bilateral superior trapezius and supra- and infrascapular areas."  (TR. 167) Upon examining Plaintiff's extremities, C.N.P. Comaduran found "[f]lattening of the upper T spine." (TR. 167) C.N.P. Comaduran's assessment included:

1.    upper trapezius strain

2.    hyperlipidemia

3.    mild obesity

(TR. 167) C.N.P. Comaduran's treatment plan was:

1. McKenzie exercises with handout and demonstration.

2. "Vioxx 50 mg. #14, 1 qd versus ibuprofen."

3. lipids and LFTs within the next month.

    4. continue diet.

    5. OSHA handout on computer positioning.

(TR. 167)

Medical records from April 16, 2002 through June 11, 2002 reflect Plaintiff's complaints of anxiety and back pain and back spasms.[4]  (TR. 163-166) Plaintiff was prescribed zoloft.  (TR. 163-166)  The record indicates that Plaintiff continued on zoloft through at least December 2003.  (TR. 236-237, 239, 255-256, 286, 291)

Beginning in April 2002 through at least August 2002, Plaintiff underwent physical therapy at Southeast Arizona Medical Center Rehabilitation Department with Physical Therapist Assistant Melissa Binkerd (hereinafter "PTA Binkerd").  (TR. 175-182, 263, 263-275) The April 19, 2002 initial physical therapy "evaluation and plan of treatment" indicated that Plaintiff's physician was Diana Comaduran and that Plaintiff "had been seen by this PT clinic in 2001 for same problems [with] little improvement.  P[atient] has continued to work until  4-16-02 when she was placed on medical leave, citing stress/conflict [with] immediate supervisor [at] work."  (TR. 182, 263) Physical Therapy progress notes from April 2002 through June 2002 reflected Plaintiff's complaints of pain and shoulder stiffness, that Plaintiff was feeling better at times and feeling stiff and sore at other times, and that Plaintiff would benefit from continued physical therapy.  (TR. 264-268)

At a June 27, 2002 follow-up visit, C.N.P. Comaduran noted Plaintiff's complaints included severe neck and shoulder pain, stress, depression, anxiety, and fatigue.  (TR. 162) Plaintiff reported stress at work, that she could not return to work because of neck pain "with any type of flexion," and that she did get some relief with zoloft.  (TR. 162) C.P.N. Comaduran's assessment indicated a worsening condition since April 1, 2002:

    1.    severe upper back pain, supra- and infraspinatous, and superior trapezius regions, minimal improvement

---

[4]The record does not reflect the medical provider who authored these treatment notes.

     2.       minimal improvement with outpatient physical therapy

     3.       severe occupational stress/anxiety.

(TR. 162) C.P.N. Comaduran's recommendations included: continuing with outpatient physical therapy for one month; arranging a consult with Dr. Carey for evaluation, treatment and pain management; and no work for one month.  (TR. 162)

A June 2002 x-ray of Plaintiff's lumbar spine revealed no spondylolysis, spondylolisthesis, or bony destructive process.  (TR. 160) The impression was "mild loss of intervertebral disk space height seen at L3-L4."  (TR. 160)

A July 5, 2002 x-ray of Plaintiff's cervical spine indicated:

> [m]oderate loss of intervertebral disk space height is seen at C5-C6 and mild to moderate loss of intervertebral disk space height is seen at C6-C7.  Mild encroachment upon both C6 and the left C7 neural canals are seen secondary to posterior osteophytes primarily arising from the uncovertebral joints.  The prevertertebral soft tissues appear normal...A partially visualized left convexity upper thoracic scoliotic curve is seen.

(TR. 161)  The impression was: "degenerative changes seen within the lower cervical spine..."  (TR. 161)

On July 11, 2002, Guy Cary, III., M.D., performed a neurological exam of Plaintiff. (TR. 156-157).  Dr. Cary's impression was:

     1.       Irritative cervical radiculopathy
     2.       Torticollis, unspecified.
     3.       Lumbar somatic dysfunction, likely musculoskeletal.
     4.       Bilateral knee pain.

(TR. 157) Dr. Cary's recommendations included: low back and neck exercises and water aerobics, further diagnostic films and evaluations, zanaflex as a "centrally acting muscle relaxer", and "alfa 2 agonist" and neurontin as pain modulators.  (TR. 157)

A July 19, 2002 MRI showed: "Fairly severe disk degeneration and dehydration...at C4-C5, C5-C6 and C6-C7";"C5-C6 mild to moderate spinal stenosis eccentric toward the right"; "C6-C7 moderate spinal stenosis midline"; and "a significant scoliosis of the thoracic spine."  (TR 144)

Also by July 2002, Plaintiff was using bracing tape to hold her spine and ribs neutral and she had begun aquatic therapy. (TR. 269)   However, PTA Binkerd was "perplexed as how to help" her. (TR. 271) Plaintiff's right "T spine remains quite prom R as well as assoc. ribs and does not respond to tx to 'unstick.'" (TR. 271)

On August 2, 2002, C.P.N. Comaduran completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical). (TR. 152-153) C.P.N. Comaduran indicated that Plaintiff could lift up to 10 pounds occasionally and less than 10 pound frequently; she could stand and/or walk for about 2 hours in an 8-hour workday; she could sit less than 6 hours in an 8-hour workday; she could never climb or crawl, frequently balance, and occasionally stoop, kneel and crouch; and she was limited in reaching, handling, and fingering. (TR. 153) C.P.N. Comaduran also indicated restrictions regarding heights and moving machinery. (TR. 153)

At physical therapy throughout August 2002, Plaintiff was tense and continued to complain of back pain. (TR. 272) Physical therapy progress notes during this time reflect that Plaintiff continued with the exercise regimen. (TR. 272) Plaintiff's September 11, 2002 "Out-Patient Progress/Discharge Summary" from physical therapy reflected that:

> [Plaintiff] con't to have multiple dysfunctions that did not improve [with] PT. Most notable are: R rib cage posterior; R thoracic vert - rotated to R; R scap winged; R scap. musculature tender to palpation appearance reveals R thoracic spine, scap are prominantly [sic] post. in position.

(TR. 275) PTA Binkerd recommended that Plaintiff "see a D.O. that specializes in manipulative tech.  Referred to Dr. Katherine Worden, D.O. in Tucson." (TR. 275)

On September 24, 2002, Plaintiff had her initial appointment with Katherine Worden, D.O. (TR. 37, 125) Dr. Worden's September 24, 2002 assessment was:

1. Somatic dysfunction globally secondary to
2. Myofascial pain syndrome with
3. Underlying cervical, thoracic, rib, lumbosacral, upper extremity and cranial strains.
4. Mild right thoracic outlet syndrome with late effects with a significant myofascial strain.

(TR. 128) Dr. Worden opined that the

- 9 -

> symptoms that the patient describes as well as the objective findings today
> support her history of ICA-related injury.  She certainly did not appear to reach
> a stationary state.   As this is primarily a soft tissue, i.e., fascial, muscle,
> ligamentous and tendinous type injury, she would benefit from soft tissue work
> that an osteopathic physician can provide.  Certainly, the muscle spasm in the
> back was recognized to be severe enough to rotate the back to the right such
> that scoliosis diagnosis was entertained.

(TR. 128) Dr. Worden recommended that Plaintiff be treated with osteopathic manipulation as well as attend an "exercise teaching series...which helps teach...how to stay in alignment and self stabilize."  (TR. 128) Dr. Worden observed that Plaintiff "appears to be sincerely interested in returning to work, has been living with moderately severe pain which has been exacerbated by work stress and situational depression affecting relationships at home."  (TR. 128)

On October 7, 2002, Dr. Worden completed a "Medical Source Statement (Mental)," which is designed to determine Plaintiff's ability to perform work related activities on a day-to -day basis in a regular work setting.  (TR. 259-261) Dr. Worden indicated that Plaintiff was  "unlimited/very good" in her ability to: follow work rules; relate to co-workers; deal with the public; use judgment; and understand, remember and carry out simple job instructions.  (TR. 259-260) Plaintiff had a "good" ability to: interact with supervisors; deal with work stresses; function independently; maintain attention/concentration; understand, remember and carry out complex and detailed job instructions; and maintain personal appearance.  (TR. 259-260) Because Dr. Worden had only evaluated Plaintiff once, she was unable to assess Plaintiff's ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability.  (TR. 260)

On October 7, 2002, Dr. Worden completed a Physical Capacities Evaluation wherein she indicated that Plaintiff: in an eight hour work day is able to sit, stand and walk for one hour at a time; in an eight hour work day is able to sit for a total of two hours a day, and stand and walk for a total of one hour per day; is able to lift up to 10 pounds occasionally but is unable to lift anything heavier than 10 pounds; is able to use her right and left hands for simple grasping and fine manipulation; is able to use her left hand for pushing and pulling

- 10 -

of arm controls but is unable to use her right hand for such action; is able to use her right foot for pushing and pulling leg controls and is unable to use her left for such action; is able to occasionally bend, crawl, and reach; is unable to squat and climb; and has mild restrictions with unprotected heights and moderate restrictions driving automotive equipment. (TR. 262)

Dr. Worden's notes from Plaintiff's follow-up visits on October 10, 2003, October 31, 2003, November 14, 2003, November 24, 2003, and December 11, 2003 consistently reflect that: Plaintiff's mood was depressed and/or anxious with chronic pain facies (TR. 257, 286, 288, 289, 291); Plaintiff's exams revealed somatic dysfunction; decreased range of motion in standing/seated/lying positions; shoulder girdle muscle imbalance with multiple small joint dysfunctions in hand wrist and elbow greater in the right than the left; mild convexity in the lower thoracic area; and major muscle spasm and trigger points in the trapezius, SCM, scalenes, levator scapulae, pectorals, latissimus dorsi, serratus posterior, superior and inferior and subscapularis. (TR. 257, 286, 288, 289, 291) Dr. Worden's assessments during this period included:

- somatic dysfunction cervical, thoracic, rib, lumbar, pelvis, sacrum, upper extremity and abdomen secondary to ICA injury with myofascial pain syndrome or acute re-exacerbation of chronic myofascial pain syndrome. (TR. 257, 286, 288, 291)

- Underlying cervical, thoracic, rib, lumbar, upper extremity strain. (TR. 257, 286, 288, 291)

- muscle tension cephalgia (TR. 289)

- anxiety (TR. 286 ("[s]ituational anxiety"), 289 ("[a]nxiety"), 291 ("[p]anic/anxiety")

- situational depression (TR. 286, 289, 291)

Also during this period, Dr. Worden prescribed pamelor, flexeril, robaxin,[5] neurontin, nortriptyline, motrin, ibuprofen, self stabilization exercises, stretching of the upper

---

[5]Plaintiff later complained that the robaxin muscle relaxer "made her feel like she was on fire, sweating and itching." (TR. 288)

extremities using one-to-two pound weights, and home cervical traction using two-to-five pound weights.  (284, 287, 288, 289, 291) Dr. Worden also directed that Plaintiff continue on zoloft.  (TR. 291)

Additionally, on November 24, 2003, Dr. Worden wrote that since her first examination of Plaintiff on September 24, 2002, it has been and continues to be her opinion that Plaintiff:

> has been totally medically disabled from work due to physical limitations of muscle spasm  and pain, at least since the time that I first saw her.  The date of the incident in question was 09/27/00.

(TR. 290)

The record also reflects that on January 2, 2004, Plaintiff had emergency care for a "bad reaction to neurontin (cronic [sic] pain)" prescribed by Dr. Worden.  (TR. 284) Plaintiff had trouble breathing, high blood pressure, anxiety attack, and uncontrollable shaking.  (TR. 284)

### b.  Mental Impairment

On May 2, 2002, Plaintiff saw counselor G. Giangregorio,  M.A., who recorded that Plaintiff's mood was depressed and anxious; she had no impairment in memory, orientation, thinking, perception, speech, or motor activity; she had fair judgment and insight; she had good impulse control and appearance; her attitude was poor; she suffered from sleep disturbance and withdrawal; she had problems at work; and was negative for substance abuse or chemical dependency. (TR. 276) Counselor Giangregorio's diagnosis was:

| | |
|---|---|
| Axis I: | 309.0 (adjustment disorder with depressed mood) |
| Axis II: | Illegible |
| Axis III: | Back Probs. |
| Axis IV: | Employment |
| Axis V: | Current Global Assessment of Functioning (hereinafter "GAF"): 67 |
| | Highest GAF past year: 75 |

- 12 -

(TR. 276) Counselor Giangregorio's treatment plan included stress management, relaxation hypnosis, and coping strategies.  (TR. 276) On May 20, 2002, Counselor Giangregorio noted Plaintiff's complaints concerning her conflict with her supervisor, that Plaintiff was taking zoloft, and that Plaintiff suffered from back pain and muscle spasms on the left side.  (TR. 277) He  confirmed his diagnosis of adjustment disorder with depressed mood.  (TR. 277) On July 30, 2002, Counselor Giangregorio's progress notes reflected that Plaintiff's supervisor "wants her terminated" and that Plaintiff complained of constant physical pain. (TR. 278) His assessment was "work related stress...depression" and he recommended that she continue on zoloft.   (TR. 278) Plaintiff discontinued treatment with Counselor Giangregorio because she did not "have any insurance."  (TR. 41)

On November 29, 2002, Plaintiff was examined by Alice F. Chang, Ph.D., Licensed Clinical Psychologist.  (TR. 186-188) Dr. Chang noted that Plaintiff cried during their interview, was "explosive", "angry about something that happened to her at work"[6], and "tended to wear her emotions on her sleeve."  (TR. 186) On mental status exam, Plaintiff

> rated a 28/30 on the Folstein Mini-Mental Status exam.  She was aware of person, place, date and time.  She was not able to subtract by 7 from 100, but was able to spell WORLD backwards without hesitation.  She did not know the season, and was unable to follow three simple consecutive commands.  She was able to recall three objects on delayed recall, and was familiar with current events.

(TR. 186) Dr. Chang noted that Plaintiff "appears  to be labile in affect and have uncontrolled reactive mood swings...She appears to have pain, both physical and emotional and reports that she is unmotivated to do anything.  She is able to manage her own finances."  (TR. 188) Dr. Chang's diagnoses was:

| | |
|---|---|
| Axis I: | 309.28 Adjustment Disorder with mixed anxiety and depressed mood |
| Axis V: | 162.20 Occupational Problem |
| Axis III: | Deferred to medical reports |

---

[6]Plaintiff explained that "her female boss" sexually harassed her and Plaintiff "feels that the boss retaliated against her for being injured, refusing to do sexual favors, and for going to the union."  (TR. 187)

(TR. 188)[7]

In April 2003, Plaintiff began psychological treatment with Kenny E. Miller, ACSE, CISW, at the Chiricahua Community Health Center.  (TR. 243) In June 5, 2003, Mr. Miller's diagnosis was:

| | | |
|---|---|---|
| Axis I: | Major depressive disorder, single episode and anxiety disorder NOS |
| Axis II: | No diagnosis |
| Axis III: | Multiple muscle spasms, severe neck and back pain |
| Axis IV: | Current: 5, severe; by history: 3, moderate |
| Axis V: | GAF: current: 60; past year: 65 |

(TR. 244)   Mr. Miller noted Plaintiff's complaints of pain and difficulty sleeping, gagging from severe anxiety over her future, and panic attacks.  (TR. 244)  Mr. Miller opined that Plaintiff

> presents with all of the symptoms of a Major Depressive episode, including the inability to concentrate, the everyday experience of fatigue and loss of energy, the loss of pleasure in daily activities, sleep disturbance, psychomotor retardation, as well as a struggle to complete the Activities of Daily Living...The physical impairment of her neck, back and other muscle spasms, in combination with the mental impairment of the Major Depressive Episode described above, leave her in my mind as *decidedly unable to sustain a living for herself* at the current time.  In the history of my 18 years of practice I have rarely seen a formerly high functioning person reduced to such a severe impairment of her functional ability.

(TR. 245)(emphasis in original) Mr. Miller found that Plaintiff was "earnest in her desires to help herself."  (TR. 245) His work with Plaintiff included "techniques in stress reduction...which she can practice for herself in her home or office environment..."  (TR. 245) Mr. Miller stated that "[t]he baseline support provided by a disability income, in combination with the psychotherapy she is currently seeking, make her an excellent candidate to break the negative spiral she has experienced."  (TR. 245)

---

[7]Dr. Chang did not indicate a diagnosis for Axis  II or IV.

Additional records from Chiricahua Community Health Center dated in December 2002 and July through August 2003 reflect that one  Nurse Hick's diagnosed Plaintiff with depression and noted Plaintiff's complaints of vertigo and trouble sleeping.  (TR. 204, 207, 236, 255) Plaintiff was advised to continue on zoloft and zanaflex was also prescribed.  (TR. 207, 236, 255)

### 2.    State-Agency Non-Examining Physicians

### a.  Physical Impairment

A Physical Residual Functional Capacity Assessment of Plaintiff was completed on October 30, 2000 by a state physician, whose name is illegible.  (TR. 130-137; see also TR. 2)   That assessment reflected that Plaintiff could lift up to 20 pounds occasionally and up to 10 pounds frequently.  (TR. 131) She could stand and/or walk about 6 hours in an 8-hour work day and she could sit about 6 hours in an 8-hour work day with normal breaks.  (TR. 131).  Plaintiff had no limitations in pushing and/or pulling.  (TR. 121) While she should never climb ladders, ropes or scaffolds, she could frequently climb ramps or stairs.  (TR. 132) The physician further stated that Plaintiff "is partially credible or her condition is not fully supported in regards to severity.  She is able to do" activities of daily living.   (TR. 135)

A March 11, 2003 Physical Residual Functional Capacity Assessment reflected that Plaintiff could lift up to 20 pounds occasionally and up to 10 pounds frequently.  (TR. 209) She could stand and/or walk about 6 hours in an 8-hour work day and she could sit about 6 hours in an 8-hour work day with normal breaks.  (TR. 209).  Plaintiff had no limitations in pushing and/or pulling.  (TR. 209) While she should never climb ladders, ropes or scaffolds, she could occasionally climb ramps or stairs.  (TR. 210) Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl.  (TR. 210) Plaintiff should also "avoid even moderate exposure" to heights due to vertigo. (TR. 212)   Plaintiff was found to be "partially credible. She is able to do" activities of daily living.  (TR. 213)

b.  Mental Impairment

On December 4, 2002, state agency physician Jack A. Marks, M.D., completed a Psychiatric Review Technique wherein he indicated that Plaintiff suffered from adjustment disorder with anxiety and depression and that such impairment was "severe but not expected to last 12 months" and, thus, the condition should be "nonsevere by 4/03."  (TR. 189) He noted Plaintiff's decreased energy, feelings of guilt or worthlessness or hopelessness and her difficulty concentrating or thinking.  (TR. 192) Dr. Marks found Plaintiff's mental impairments resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. (TR. 199) Dr. Marks also noted that Plaintiff was "[p]artially credible, findings consistent to partial support of allegations."  (TR. 201)

On March 7, 2003 Dr. Paul Tangeman completed a Psychiatric Review Technique wherein he indicated that Plaintiff  suffered from adjustment disorder and that such impairment was "not severe." (TR. 216) He found that Plaintiff's mental impairment resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace.  (TR. 226) Dr. Tangeman also noted that Plaintiff's cognitive abilities were "adequate, social skills are appropriate, [Plaintiff] is independent in all" activities of daily living, and "her functional limitations appear less than severe." (TR. 228)  Dr. Tangeman further stated that his findings were consistent with "partial support of [Plaintiff's] allegations."  (TR. 228)

C.      The ALJ's Findings

1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in

substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c), 416.920(c).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id*.  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id*.  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[8] to perform past work.   20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.  *Id*. However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying

---

[8]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545.

claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).   However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply. *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

   2.   The ALJ's Decision

In her December 3, 2003 Decision, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since the alleged onset date of disability.

2.   The claimant has an impairment or a combination of impairments considered "severe" based on the requirements of 20 CFR 404.1520(b).

3.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.   The undersigned finds that the claimant's allegations regarding her limitations are partially credible for reasons stated above.

5.   The undersigned has carefully considered all the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR 404.1527)

6.   The claimant has the residual functional capacity to do a full range of light-level exertional work with postural limitations. She cannot frequently climb, balance, stoop, kneel, crouch, and crawl and cannot climb ladders/ropes/scaffolds.  The claimant also has limited ability to push and/or pull in her upper extremities and must avoid hazards such as machinery and heights.  She has no non-exertional mental limitations.

7.   The claimant's past relevant work as a low-income housing placement worker did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR 404.1565).

8.   The claimant's medically determinable degenerative disc disease and chronic back pain do not prevent the claimant from performing her past relevant work.

9.      The claimant was not under a "disability," as defined by the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e)).

<u>DECISION</u>

It is the decision of the Administrative Law Judge that, based on the application filed July 12, 2002, the claimant is not entitled to a period of disability or disability insurance benefits under Sections 216(l) and 223, respectively, of the Social Security Act.

(TR. 16-17)

In adopting the state non-examining physicians' conclusion that Plaintiff could perform light work, the ALJ rejected Dr. Worden's October 2002 opinion that Plaintiff could not work.  The ALJ gave "minimal weight" to Dr. Worden's finding for the following reasons: Dr. Worden reached this conclusion "after having seen the claimant only twice"; Dr. Worden's conclusion is contradicted by the medical evidence and the record as a whole; "[i]f the physical limitations set forth by Dr. Worden were accurate, the claimant would have to spend most of the day lying down which she does not do" based on Plaintiff's testimony and interview with Dr. Chang; and Plaintiff consistently looks for sedentary-level employment despite Dr. Worden's opinion that she cannot work.  (TR. 16)

The ALJ also rejected Nurse Comaduran's August 2, 2002 assessment of Plaintiff's work limitations because Nurse Comaduran, as a "family nurse practitioner," is "not an acceptable medical source under 20 CFR 404.1513, and is contradicted by the medical evidence."  (TR. 16)

When assessing Plaintiff's allegation of psychiatric limitations, the ALJ "rejected" Kenneth Miller's conclusion that Plaintiff suffers from major depressive and anxiety disorders and thus cannot work.  The ALJ gave "no weight" to Mr. Miller's opinion and treatment notes because: "Mr. Miller is a social worker and not a psychologist or psychiatrist" and therefore he is not an acceptable medical source; Mr. Miller's findings are inconsistent with the GAF scores of 60 and 65 which he assessed; apart from medication to help her sleep, Plaintiff does not take medication for her alleged mental impairments;

- 19 -

Plaintiff  "does not seek medical treatment for her alleged mental impairments"; and Mr.
Miller's findings are contradicted by Dr. Chang and two state agency doctors.  (TR. 15-16)

The ALJ further found that Plaintiff did not have a medically determinable impairment
that could reasonably be expected to produce her subjective symptoms.  To support this
conclusion, the ALJ pointed out that "[t]he medical evidence indicates the claimant's
symptoms respond to therapy and medication, though she is likely to always have some
pain...She alleged no difficulty performing activities of daily living...The claimant noted that
she cooks and shops for herself and that she can do housework, such as washing the dishes
and laundry.  She reports no side effects from the medication...claimant reported that she
sometimes uses a sewing machine."  (TR. 17) The ALJ also found Plaintiff "only partially
credible with respect to her impairments" due to Plaintiff's testimony that "her back and neck
pain never lets up and [Plaintiff] rated the intensity of the pain at 9, on a scale of 1 to 10, with
10 being excruciating pain that would compel a visit to the emergency room.  Her demeanor
during the 30-minute hearing was entirely inconsistent with such a level of pain, and no
examining source noted such discomfort."  (TR. 17) The ALJ found that Plaintiff's continued
search for sedentary work also undermined Plaintiff's credibility.  (TR. 17)

III.    ARGUMENT

Plaintiff contends that "[a]ll of the Commissioner's offered reasons for rejecting Dr.
Worden's opinion fail to meet specific and legitimate standards."  (Plaintiff's MSJ, p.10)

Plaintiff also takes issue with the ALJ's rejection of Nurse Comaduran's and Mr.
Miller's opinions.  Plaintiff points out that the regulations allow the Commissioner to
consider other medical sources which can include nurse practitioners.  (Id. *citing* 20 CFR §
404.1513(d))  Plaintiff also argues that, contrary to the ALJ's assertion, the record does not
contradict either provider's opinions.

Plaintiff argues that the ALJ's stated reasons for finding Plaintiff only partially
credible are not supported by the record.  Plaintiff stresses that she has consistently taken

zoloft, that she had no medical coverage for mental health treatment, and that she had in fact experienced side effects from her medication.  (Id. at pp. 12-13)

Defendant argues that the ALJ gave sufficient reasons for rejecting Dr. Worden's opinion. Defendant also maintains that Dr. Worden cannot be considered a treating source because she only saw Plaintiff once prior to making her October 2002 disability determination.[9]  Further, according to Defendant, Dr. Worden's conclusion is contradicted by her own medical finding and Plaintiff's testimony. (Defendant's XMSJ, p.4)

Defendant also argues that contrary to Plaintiff's assertion that the ALJ failed to consider Nurse Comaduran's and Mr. Miller's  opinions, the ALJ in fact considered and properly rejected such opinion by establishing that they were contradicted by other evidence in the record.  Defendant further contends that the ALJ set forth proper reasons for her credibility determination.

## IV.     STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 423(d)(1)(A), an insured individual is entitled to disability insurance benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months.  The Ninth Circuit has stated that "'[a] claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir.

---

[9]Defendant incorrectly indicates that Dr. Worden's disability determination was made on October 7, 2003.  (Defendant's XMSJ, p.4 citing TR. 262) The date of that determination is October 7, 2002.  (TR. 262)

1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

Pursuant to 42 U.S.C. §405(g), the findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted).  Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision.  *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)).  Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion.  *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988).  However, substantial evidence is less than a preponderance.  *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly.  *Id.*  However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly.  *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion.  *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight.  *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability.  *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or nonexamining physician, the opinion of the treating physician is entitled to greater weight

- 22 -

and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751.  Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted).  However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

V.      DISCUSSION

Plaintiff challenges the ALJ's rejection of Dr. Worden's determination that Plaintiff is disabled.

The record reflects that Dr. Worden's records from October 31, 2003 to December 11, 2003, were not among the records submitted to the ALJ, but were subsequently made "part of the record" upon their submission to the Appeals Council.[10]  (TR. 9) In denying Plaintiff's request for review of the ALJ's decision, the Appeals Council, considered *inter alia* Plaintiff's additional evidence including Dr. Worden's 2003 records, and determined that such "information does not provide a basis for changing the Administrative Law Judge's decision." (TR. 6-7)   Defendant, in his XMSJ does not contend that the Appeals Counsel considered Dr. Worden's 2003 records in error.  Nor does Defendant contend that this Court should not consider that information.   In fact, Defendant does not address the 2003 records at all.

---

[10]At the time the ALJ made her decision, the following documents authored by Dr. Worden were in the record: September 24, 2002 Initial Osteopathic Evaluation (TR. 125-128), October 7, 2002 "Medical Source Statement (Mental)" (TR. 259-261), and October 7, 2002 "Physical Capacities Evaluation" (TR. 262).  Plaintiff testified at the November 19, 2003 hearing that she first saw Dr. Worden in September 2002 and that she was still seeing her.  (TR. 37-38. 43)

The Ninth Circuit has held that under such circumstances, "we consider on appeal both the ALJ's decision and the additional material submitted to the Appeals Council." *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993) (*citing* 20 CFR § 404.970(b)); *See also* 20 CFR § 404.970(b) (providing that the Appeals Council shall evaluate the record including new and material evidence predating the ALJ's hearing decision and shall review the decision of the ALJ if the ALJ's actions, findings, or conclusions of law are contrary to the weight of the evidence in the record); (TR. 6 (the Appeals Council will review a case for any of the following reasons: the administrative law judge appears to have abused his or her discretion; there is an error of law; the decision is not supported by substantial evidence; there is a broad procedural issue that may affect the public interest; the Appeals Council receives new and material evidence and the decision is contrary to the weight of all the evidence now in the record.)) Therefore, Dr. Worden's 2003 records submitted to the Appeals Council are properly considered herein. *See Ramirez*, 8 F.3d at 1452.

Defendant argues that "Dr. Worden's opinion was not entitled to the great weight that is given to the opinion of a treating physician" because Dr. Worden had seen plaintiff only once[11] prior to rending her October 2002 opinion that Plaintiff was unable to work. (Defendant's XMSJ, pp. 3-4)

It is well settled that the opinions of treating physicians are entitled to greater weight than the opinions of examining or non-examining physicians. *Andrews v. Shalala*, 53 F.3d 1035, 1040-1041 (9th Cir. 1995). Therefore, "[a] treating physician's opinion on disability even if controverted can be rejected only with specific and legitimate reasons supported by substantial evidence in the record." *Reddick*, 157 F.3d at 725 (*citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). *See also Holohan v. Massanari*, 246 F.3d 1195, 1202-1203 (9th Cir. 2001). "We afford greater weight to a treating physician's opinion because he is

---

[11]Defendant states: "Although the ALJ found that Dr. Worden saw Plaintiff only twice before expressing her opinion (TR. 16), the record reveals that she had seen Plaintiff only once." (Defendant's XMSJ, p.4)

employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes,* 881 F.2d at 751.  Defendant is correct to the extent that "[u]nder certain circumstances, a treating physician's opinion on some matter may be entitled to little if any weight.  This might be the case for instance, if the treating physician has not seen the patient long enough to 'have obtained a longitudinal picture' of the patient's impairments, 20 CFR § 404.1527(d)(2)(i), offers an opinion on a matter not related to his or her area of specialization, *see id.* § 404.1527(d)(5), and presents no support for her or his opinion on the matter.  *see id.* § 404.1527(d)(3)."  *Holohan,* 246 F.3d at 1202 n.2.  However, even if Dr. Worden is considered as an "examining physician" rather than a "treating physician," her opinion would still be entitled to greater weight than the opinion of a "nonexamining" physician. *Lester,* 81 F.3d at 830.  "And like the opinion of a treating doctor, the examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  *Id.* at 830-831 (this standard also applies when the ALJ rejects opinions from the examining physician in favor of the nonexamining physician).

To support her position, Defendant relies on *Matney v. Sullivan,* wherein the Ninth Circuit approved of the ALJ's determination that the treating doctor's opinion was entitled to little weight because he had examined Plaintiff only one time, "produced a brief report", and "[t]he diagnosis was based primarily upon the medical history and subjective complaints as related by" the plaintiff.  *Matney,* 981 F.2d at 1020.  The instant case is distinguishable from *Matney.*

Prior to Dr. Worden's October 7, 2002 opinion that Plaintiff was unable to work, Dr. Worden completed an Initial Osteopathic Evaluation of Plaintiff on September  24, 2002. (TR. 125-129) In Dr. Worden's four-page report memorializing her September 24, 2002 evaluation of Plaintiff, Dr. Worden documents Plaintiff's treatment history including Plaintiff's completion of several courses of physical therapy, visits to Dr. Tyson, D.C. for "some massage, electric stim.", Plaintiff's complaints of pain, and that muscle relaxers had

been prescribed for Plaintiff. (TR. 125) Dr. Worden performed her own physical examination of Plaintiff which included: general observations; Plaintiff's vitals; assessment of Plaintiff's neurologic, osteopathic, and postural condition; and assessment of Plaintiff's sacrum, lower extremities, abdomen, lumbar and cervical spine, and head.   Additionally, Dr. Worden considered the following medical records which Plaintiff brought to the examination:

- patient progress notes from Dr. Knapp's office and Dr. Padilla's office;

- a May 30, 2001 IME done by Dr. Robert Schumacher; and

- a letter from Dr. Schumacher making reference to a December 12, 2001 MRI of Plaintiff's right shoulder.

Upon review of these records, Dr. Worden noted that the records "support the history that [Plaintiff] gave" her, that they show that Plaintiff "had good compliance in follow through and that even Dr. Schumacher was considering a shoulder decompressive surgery at that time."  (TR. 128) Thus, unlike the brief report in *Matney* that was based primarily on the plaintiff's subjective complaints and rendition of his medical history, Dr. Worden completed the October 7, 2002 Physical Capacities Evaluation after she had performed a thorough physical exam and after she had reviewed Plaintiff's prior medical records which she determined supported Plaintiff's history as related by Plaintiff.

Further, Dr. Worden saw Plaintiff again one year later on October 10, 2003 and continued to treat Plaintiff on October 31, 2003, November 14, 2003, November 24, 2003, and December 11, 2003.  On November 24, 2003, Dr. Worden stated that Plaintiff "has been totally medically disabled from work due to physical limitations of muscle spasm and pain" since at least September 24, 2002 when Dr. Worden first examined her.  (TR. 290) Despite the submission of Dr. Worden's 2003 records, including the November 24, 2003 opinion that Plaintiff remained disabled, the Appeal's Council saw no reason to disturb the ALJ's rejection of Dr. Worden's opinion that Plaintiff was disabled.   The decision to accept the non-examining doctor's opinion over Dr. Worden's opinion must be supported by specific and

legitimate reasons which in turn are supported by substantial evidence in the record.  *See Holohan,* 246 F.3d at 1201-1203; *Lester,* 81 F.3d at 830-831.

The ALJ rejected Dr. Worden's opinion because "it is contradicted by the medical evidence and the record as a whole" and under "the physical limitations set forth by Dr. Worden...[Plaintiff] would have to spend most of the day lying down, which she does not do" given that she watches television, washes dishes, cares for herself, walks for a hobby and consistently looks for sedentary-level employment.  (TR. 16) The ALJ also pointed out that "Dr. Worden reached her conclusion after having seen...[Plaintiff] only twice."[12]  (TR. 16)

To bolster the ALJ's finding, Defendant stresses that radiological reports revealed only mild to moderate abnormalities, that Dr. Worden's clinical findings did not show Plaintiff could perform less than a light range of work, and that Dr. Worden indicated Plaintiff had "only a soft tissue issue that would improve with treatment."  (Defendant's XMSJ, p.4) The substantial evidence in the record does not support Defendant's characterization.

By the time Plaintiff first visited Dr. Worden in September 2002, Plaintiff had completed a course of physical therapy for shoulder bursitis in 2001 and as of 2001 Dr. Schumacher had considered shoulder decompressive surgery.  In early 2002, Dr. Padilla had informed Plaintiff that her complaints were common with shoulder bursitis; that she should use anti-inflammatories; and that she could expect to always have shoulder pain. Throughout 2002, Plaintiff complained numerous times to her primary care provider's certified nurse practitioner about constant back pain, neck pain and back spasms.  Plaintiff was prescribed muscle relaxers, ibuprofen, and zoloft.  Radiological reports dated June 20, 2002 and July

---

[12]Defendant points out that the ALJ was mistaken regarding the number of times that Dr. Worden saw Plaintiff before completing the October 7, 2002 Physical Capacities Evaluation: "Although the ALJ found that Dr. Worden had seen Plaintiff twice before expressing her opinion (TR. 16), the record reveals that she had seen Plaintiff only once." (Defendant's XMSJ, p.4) In light of the Appeal Council's consideration of additional treatment records from Dr. Worden, including Dr. Worden's November 24, 2003 opinion that Plaintiff continued to be disabled, rejection of Dr. Worden's opinion for the reason that she had only seen Plaintiff once, or twice, is no longer valid.

5, 2002 indicated "mild loss of intervertebral disk space height...at L3-L4" and "degenerative changes...within the lower cervical spine" including moderate loss of intervetrebral disk space height at C5-C6, mild to moderate loss of disk space height at C6-C7, mild encroachment upon C6-C7 neural canals. (TR. 160, 161) A July 19, 2002 MRI revealed "[f]airly severe disk degeneration and dehydration" at C4-C5, C5-C-6, and C6-C7 in addition to mild to moderate stenosis at C5-C6, moderate spinal stenosis at C6-C7, and significant scoliosis of the thoracic spine. (TR. 144) Additionally, in July 2002, neurologist Cary diagnosed irritative cervical radiculopathy, torticollis, and "[l]umbar somatic dysfunction, likely musculoskeletal." (TR. 157)

Also prior to her first visit to Dr. Worden, Plaintiff completed a second course of physical therapy to no avail. It was the lack of success with this course of physical therapy that prompted referral to Dr. Worden in the hope that a "D.O. that specializes in manipulative tech" could help Plaintiff. (TR. 275) ("Pt. con't to have multiple dysfunctions that did not improve with Pt. Most notable are: R rib cage posterior: R thoracic vert rotated to R: R scap winged: R scap. musculature tender to palpation appearance reveals R thoracic spine, scap are prominently post. in position.") Dr. Worden's notes reflect that Plaintiff also underwent electric stimulation to no avail and that Plaintiff declined cortisone shots to her shoulder. By November 24, 2003, Plaintiff had not improved despite undergoing osteopathic manipulative treatments with Dr. Worden and despite trying various medications. (*See* TR. 290)

Plaintiff aptly points out that Defendant's characterization of the radiological reports as showing only mild to moderate abnormalities overlooks the July 19, 2002 MRI indicting "[f]airly severe disk degeneration and dehydration" at the cervical spine. (Plaintiff's Reply, p.3; *see also* TR. 144) There is no dispute that Dr. Worden's examinations of Plaintiff revealed that Plaintiff suffered from soft tissue issues, including chronic myofascial pain syndrome. Dr. Worden consistently diagnosed underlying cervical, thoracic, rib, lumbar, and upper extremity strain and found that Plaintiff did not improve despite osteopathic

manipulative therapy and changes in medication.  Dr. Worden's opinion is supported by her own treatment records in addition to the medical evidence as a whole.

Further, nothing in Plaintiff's testimony is inconsistent with Dr. Worden's finding.  Dr. Worden found that Plaintiff could sit for one hour at a time for a total of two hours, stand for one hour at a time for a total of one hour and walk for one hour at a time for a total of one hour during an 8-hour workday.  (TR. 262) Plaintiff testified that she can sit in a chair "about half an hour."  (TR. 46) As a hobby, she uses a sewing machine for mending and she is able to sit at the sewing machine for "[p]robably about half an hour."  (TR. 50-51) Plaintiff also testified that she is unable to stand more than "[a]n hour or so" because she "get[s]...a pinched nerve back here."  (TR. 46) Although she tries to walk on a regular basis, "it takes a lot out of...my back, the pain that I have..." and as a result she walks "less than a mile...[a]bout twice a week."  (TR. 46-47) Plaintiff's statements in the record reflect that she spends much of the day at home watching television.  There is no evidence in the record describing Plaintiff's body position while she is watching televison or whether or how often she has to change positions during this activity.

Dr. Worden found that Plaintiff could lift up to 10 pounds occasionally and should never lift anything heavier.  Plaintiff testified that she has difficulty lifting bags of groceries and even though she can lift a gallon of milk, "it takes a lot...out of my back."  (TR. 48)

The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated' in order to be disable." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001) (*quoting Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)); *see also Vick v. Commissioner of the Social Security Admin.,* 57 F.Supp.2d 1077, 1086 (D. Or. 1999) ("if a claimant's activity is in harmony with her disability, the activity does not necessarily indicate an ability to work.")   The question is whether the plaintiff spends a "'substantial part of his [or her] day engaged in pursuits involving the performance of

physical functions that are transferrable to a work setting...' Thus, if a claimant is capable of performing activities including household chores, 'that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.'" *Vick,* 57 F.Supp.2d at 1085-1086 (*quoting Fair,* 885 F.2d at 602)(emphasis in original).

Contrary to the ALJ's finding, Plaintiff's statements concerning her activities and abilities to sit, stand, walk. and lift are consistent with, as opposed to contradictory to, the limitations set forth by Dr. Worden.  The evidence of record does not support the conclusion that Plaintiff spends a substantial part of her day engaged in pursuits that would require a functional capacity different from that identified from Dr. Worden.

Plaintiff also persuasively argues that the ALJ improperly relied on evidence that Plaintiff continues to look for work.  Although Plaintiff testified that she continues to look for administrative or clerical work, she stresses that she also testified that she did not think she could do that type of work.   (TR. 51) Plaintiff points out that social security applicants may look for work because they are stubborn and refuse "to acknowledge an inability to work, sometimes they are required to look for work by some other agency such as workers compensation in this case and sometimes the work that they are looking for is so limited that it could not be considered substantial gainful activity in the eyes of the Social Security Administration.  One or all of these issues were behind Plaintiff's acknowledgment..." that she had looked for work "but the ALJ did not ask."  (Plaintiff's Reply, p.4) Plaintiff herein was not represented by counsel at the hearing before the ALJ.  Plaintiff's undeveloped testimony that she looked for work despite her belief that she was unable to perform such work, does not in and of itself contradict Dr. Worden's opinion.[13]   Accordingly, for the

---

[13]This same rationale undercuts the ALJ's reliance on Plaintiff's search for employment as a reason for discrediting Plaintiff's credibility.  (*See* TR. 17) Further, the ALJ's finding that Plaintiff "herself does not believe that her impairments and symptoms prevent her from doing the kind of work she has done in the past" (TR. 17) is undermined

foregoing reasons, Defendant has failed to establish that the ALJ provided "legally sufficient reasons for rejecting" Dr. Worden's opinion.   *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004).   Where the ALJ failed to provide legally sufficient reasons for rejecting a treating physician's opinion, the Ninth Circuit credits that opinion as true.  *Id.* at 594.

> Remand for an award of benefits is appropriate where:
>
> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* at 593 (citations omitted).   Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits."  *Id.* (citations omitted); *see also Lester,* 81 F.3d at 834.  As set forth above, the ALJ failed to set forth legally sufficient reasons for rejecting Dr. Worden's disability finding which Dr. Worden reaffirmed in November 2003.  The record is complete and there are no outstanding issues that must be resolved before a disability finding can be made.  There is no dispute that the restrictions specified by Dr. Worden when credited as true, require a finding of disability under the Social Security Act  Therefore, the requirements for remand for an award of benefits have been met.

It has been over four years since Plaintiff applied for benefits.  The Ninth Circuit has recognized that "[r]emanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their

by Plaintiff's testimony that although she has looked for work she did not think that she could perform that work. Moreover, despite the ALJ's finding that Plaintiff could return to her previous work, there is scant evidence in the record concerning the requirements and duties of that work.  Nor did the ALJ refer to the *Dictionary of Occupational Titles* or other sources for such information. *See e.g. Johnson v. Shalala,* 60 F.3d 1428, 1432 & n. 6 (9th Cir. 1995) (recognizing that the *Dictionary of Occupational Titles* is the Commissioner's "primary source of reliable job information" and that the Commissioner "regularly relies" on job descriptions contained therein).

appeals and proceedings on remand.'" *Benecke,* 379 F.3d at 595 (*quoting Varney v. Secretary of Health and Human Services,* 859 F.2d 1396, 1398 (9th Cir. 1988); *see also Terry v. Sullivan,* 903 F.2d 1273 (9th Cir. 1990) (remanding for an award of benefits where the plaintiff applied almost four years prior); *Erickson v. Shalala,* 9 F.3d 813 (9th Cir. 1993) (remanding for an award of benefits where plaintiff, who was disabled under the Act, "has been waiting for well over four years for his disability benefits").  On the instant record, where the ALJ failed to provide adequate reason for rejecting the opinion of Plaintiff's treating physician and where Plaintiff has satisfied all three factors in favor of a remand for an award of benefits, "[r]emanding for further administrative proceedings would serve no useful purpose and would unnecessarily extend...[Plaintiff's] long wait for benefits." *Benecke*, 379 F.3d at 595.  *See also*. *Regennitter v. Commissioner,* 166 F.3d 1294, 1300 (9th Cir. 1999) (where the court "conclude[s] that...a doctor's opinion should have been credited and, if credited, would have led to a finding of eligibility, we may order the payment of benefits.");  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990) (remanding for payment of benefits where the Secretary did not provide adequate reasons for disregarding examining physician's opinion);  *Winans,* 853 F.2d at 647  (same).   Therefore, Plaintiff's Motion for Summary Judgment should be granted and this matter should be remanded for an award of benefits.

## VI.    RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court grant Plaintiff's Motion for Summary Judgment (Doc. No. 6), deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 11), and remand this action for an award of benefits.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number:  CV 04-323-TUC-JMR.  A party

may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 28th day of February, 2007.


_____
Héctor C. Estrada
United States Magistrate Judge